1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NICHOLAS ALEXANDER ACZEL,

Plaintiff,

v.

CAROLYN W. COLVIN,

Defendant.

Case No.  14-cv-01766-JCS

**ORDER RE MOTION FOR SUMMARY JUDGMENT OR REMAND**

Re: Dkt. No. 13

## I.      INTRODUCTION

Plaintiff Nicholas Aczel seeks review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") finding that Aczel became disabled on December 1, 2010 and was not disabled prior to that date.  Aczel asks the Court to reverse the Commissioner's disability onset date and remand with instructions to award benefits beginning on July 30, 2000, or, in the alternative, to remand for further administrative proceedings.  For the reasons stated below, the Court GRANTS Plaintiff's Motion for Summary Judgment, DENIES Defendant's Motion for Summary Judgment, and REMANDS to the Commissioner for further proceedings.[1]

## II.     BACKGROUND

### A.      Procedural Background

Aczel applied for disability benefits in December 2010 alleging that he had been disabled since July 30, 2000 (his eighteenth birthday) due to Autism, learning and socialization limitations, and Seizure Disorder.  Administrative Record ("AR") at 147–52, 171.  The Social Security Administration denied Aczel's claim on July 27, 2011 and affirmed the denial on reconsideration

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

on January 27, 2012.  AR 19, 116–19.  On February 24, 2012, Aczel requested a hearing before an administrative law judge.  AR 121.  Administrative Law Judge Catherine R. Lazuran (the "ALJ") held a hearing on June 5, 2012, and issued a partially favorable decision on September 26, 2012 finding that Aczel became disabled on December 1, 2010 but was not disabled prior to that date.  AR 30.  The Social Security Administration Appeals Council denied Aczel's request for review on February 28, 2014, adopting the ALJ's decision as the final decision of the Commissioner.  AR 1– 5.  Aczel filed this action on April 17, 2014.  Compl. (dtk. 1).  Aczel filed a Motion for Summary Judgment or Remand on October 24, 2014.  Pl.'s Mot. (dkt. 13).  The Commissioner filed a Cross-Motion for Summary Judgment on December 12, 2014.  Comm'r's Mot. (dkt. 17).  Aczel filed a Reply Memorandum in Support of his Motion for Summary Judgment or Remand on January 12, 2015.  Reply (dkt. 20).

**B.     Legal Background**

**1.     Social Security Benefits Available to Disabled Claimants**

A disabled claimant may qualify for Supplemental Security Income ("SSI") benefits if the claimant has limited income and owns less than $2,000 in "resources," not counting the claimant's primary home and certain other assets.  42 U.S.C. § 1382(a).  Regardless of a claimant's disability onset date, SSI benefits are payable only for months following the month in which the claimant filed his application for SSI benefits.  20 C.F.R. § 416.335.

A disabled claimant may qualify for Social Security Disability Insurance ("SSDI") benefits if the claimant has worked and paid into Social Security for at least 20 quarters during the 40-quarter period leading up to the claimant's disability onset date.  *See* 42 U.S.C. § 423(c)(1)(B)(i).  However, even if a claimant does not independently qualify for SSDI benefits, the claimant may qualify for SSDI benefits based on his parents' Social Security contributions if his disability onset date precedes his 22nd birthday and he is unmarried.  *See* 42 U.S.C. § 402(d).

**2.     Review of the Commissioner's Final Decisions**

District courts have jurisdiction to review the final decisions of the Commissioner and have the power to affirm, modify, or reverse the Commissioner's decisions, with or without remanding for further hearings.  42 U.S.C. § 405(g).  When reviewing the Commissioner's

1  decisions, district courts must take as conclusive any of the Commissioner's factual findings that

2  are supported by "substantial evidence." *Id*. However, even if the Commissioner's findings are

3  supported by substantial evidence, they should be set aside if proper legal standards were not

4  applied when weighing the evidence and in reaching a decision. *Benitez v. Califano*, 573 F.2d

5  653, 655 (9th Cir. 1978). If a reviewing court identifies defects in the administrative proceeding

6  or the Commissioner's conclusions, it may remand for further proceedings or for a calculation of

7  benefits. *See Garrison v. Colvin*, 759 F.3d 995, 1019−21 (9th Cir. 2014).

### 3.    Five-Step Framework for Determining General Disability

8

9  Disability insurance benefits are available under the Social Security Act when an eligible

10  claimant is unable "to engage in any substantial gainful activity by reason of any medically

11  determinable physical or mental impairment . . . which has lasted or can be expected to last for a

12  continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C.

13  § 423(a)(1). A claimant is only found disabled if his physical or mental impairments are of such

14  severity that he is not only unable to do his previous work but also "cannot, considering his age,

15  education, and work experience, engage in any other kind of substantial gainful work which exists

16  in the national economy." 42 U.S.C. § 423(d)(2)(A).

17  The Commissioner has established a sequential five-part evaluation process to determine

18  whether a claimant is disabled under the Social Security Act. 20 C.F.R. § 404.1520(a). If the

19  Commissioner concludes that the claimant is or is not disabled at one of the steps, the

20  Commissioner does not proceed to the next step. 20 C.F.R. § 404.1520(a)(4). Otherwise, the

21  evaluation proceeds to the next step. *Id*. The claimant bears the burden of proving Steps One

22  through Four. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). At Step Five, the burden shifts

23  to the Commissioner to prove that the claimant can perform other work. *See Distasio v. Shalala*,

24  47 F.3d 348, 349 (9th Cir. 1995).

25  At Step One, the Commissioner considers the claimant's work history. 20 C.F.R.

26  § 404.1520(a)(4)(i). If the claimant is doing "substantially gainful activity," the claimant is not

27  disabled and the evaluation ends. *Id*. If the claimant is not doing "substantially gainful activity,"

28  the evaluation proceeds to Step Two. 20 C.F.R. § 404.1520(a)(4).

United States District Court
Northern District of California

At Step Two, the Commissioner considers whether the claimant has a "severe medically determinable physical or mental impairment" or combination of such impairments that has lasted or is expected to last more than 12 months. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). "[T]he step two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (citing *Bowen v. Yuckert*, 482 U.S. 137, 153–54 (1987)). "A claim may be denied at step two only if the evidence shows that the individual's impairments, when considered in combination, are not medically severe, i.e., do not have more than a minimal effect on the person's physical or mental ability(ies) to perform basic work activities." Social Security Ruling ("SSR") 85-28. If medical evidence does not clearly establish such a finding, the evaluation proceeds to Step Three. 20 C.F.R. § 404.1520(a)(4).

At Step Three, the Commissioner compares the claimant's impairment(s) with a list of impairments that the Commissioner has determined are disabling ("Appendix 1"). 20 C.F.R. § 404.1520(a)(4)(iii). If the impairment(s) "meets or equals" in severity an item on the list and meets the duration requirement, the claimant is disabled. *Id*. Otherwise, the evaluation proceeds to Step Four. 20 C.F.R. § 404.1520(a)(4).

At Step Four, the Commissioner considers the claimant's residual functional capacity. 20 C.F.R. § 404.1520(a)(4)(iv). A claimant's residual functional capacity is the most the claimant can do in light of the physical and/or mental limitations caused by the impairment(s). 20 C.F.R. § 404.1545. If the claimant can perform his or her past relevant work, the claimant is not disabled. *Id*. Past relevant work is work that the claimant has done in the fifteen months prior to the evaluation and was substantial gainful activity that lasted long enough for the claimant to learn to do it. 20 C.F.R. § 404.1560(b)(1). If the claimant cannot perform his or her past relevant work, the evaluation proceeds to Step Five. *See* 20 C.F.R. § 404.1545(a)(5)(ii).

At Step Five, the Commissioner has the burden to demonstrate that the claimant can perform "other work" that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity, age, education, and work experience. *Tackett*

1  *v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999) (citing 20 C.F.R § 404.1560(b)(3));  20 C.F.R

2  § 404.1520(a)(4)(v).  If the Commissioner finds the claimant can make an adjustment to other

3  work, the claimant is not disabled.  *Id*.  Otherwise, the claimant is disabled and eligible for

4  disability benefits.  20 C.F.R § 404.1520(a)(4)(v).

### 4.   Supplemental Rules for Determining Mental Disability

6  The Social Security Administration has supplemented the five-step general disability

7  evaluation process with regulations governing the evaluation of mental impairments at Steps Two

8  and Three of the five-step process.  *See generally* 20 C.F.R. § 404.1520a; *see also Clayton v.*

9  *Astrue*, No. CIV 09-2282-EFB, 2011 WL 997144, at *3 (E.D. Cal. Mar. 17, 2011) (citing *Maier v.*

10  *Comm'r of Soc. Sec. Admin.*, 154 F.3d 913 (9th Cir. 1998)).  First, the Commissioner must

11  determine whether the claimant has a medically determinable mental impairment.  20 C.F.R.

12  § 404.1520a(b)(1).  Next, the Commissioner must assess the degree of functional limitation

13  resulting from the claimant's mental impairment with respect to four broad functional areas: 1)

14  activities of daily living; 2) social functioning; 3) concentration, persistence, or pace; and 4)

15  episodes of decompensation.  20 C.F.R. § 404.1520a(b)(2), (c).  Finally, the Commissioner must

16  determine the severity of the claimant's mental impairment and whether that severity meets or

17  equals the severity of a mental impairment listed in Appendix 1.  20 C.F.R. § 404.1520a(d).  If the

18  Commissioner determines that the severity of the claimant's mental impairment meets or equals

19  the severity of a listed mental impairment, the claimant is disabled.  *See* 20 C.F.R.

20  § 404.1520(a)(4)(iii).  Otherwise, the evaluation proceeds to Step Four of the general disability

21  inquiry.  *See* 20 C.F.R. § 404.1520a(d)(3).

22  Appendix 1 provides impairment-specific "Paragraph A" criteria for determining the

23  presence of various listed mental impairments, but all listed mental impairments share certain

24  "Paragraph B" severity criteria in common (and some have alternative "Paragraph C" severity

25  criteria).  *See generally* 20 C.F.R. § 404, Subpt. P, App. 1 at 12.00.  Therefore, any medically

26  determinable mental impairment—i.e., one that satisfies the Paragraph A criteria of one or more

27  listed mental impairments—is sufficiently severe to render a claimant disabled if it satisfies the

28  general Paragraph B criteria, which require that the claimant suffers at least two of the following:

United States District Court
Northern District of California

1) marked restriction of activities of daily living; 2) marked difficulties in maintaining social

functioning; 3) marked difficulties in maintaining concentration, persistence, or pace; or 4)

repeated episodes of decompensation, each of extended duration. *See id*. A "marked" limitation is

one that is "more than moderate but less than extreme" and "may arise when several activities or

functions are impaired, or even when only one is impaired, as long as the degree of limitation is

such as to interfere seriously with [a claimant's] ability to function independently, appropriately,

effectively, and on a sustained basis." *Id.* at 12.00C.

      **C.**     **The Plaintiff's History**

          **1.**     **Medical History**

               **a.**     **Mental Impairments: Autism Spectrum Disorder[2] and Anxiety Disorder**

Aczel started to use single words when he was 18 months old, but his social use of

language was "limited." AR 513. Aczel's parents were concerned about his lack of social

interaction from the time he was in preschool. AR 514. Although his cognitive abilities were

normal, Aczel had "great difficulty" interacting with other students. *See* AR 476.

In April 1992, at age nine, Aczel was diagnosed with "high-functioning autism" at the

University of North Carolina's Chapel Hill TEACCH Center and became classified as autistic in

the public school system. *See* AR 471, 475–84, 526–28.

In October 1995, at age 13, Aczel was evaluated by Alfred G. Soulier, Certified School

Psychologist, and found to "demonstrate behaviors indicative of autism." AR 475–484. Mr.

Soulier noted that Aczel showed "a significant qualitative impairment of social interaction and

verbal communication" and that Aczel's pre-existing disability accommodations "appear[ed]

appropriate." AR 483.

In December 1996, at age 14, Aczel was evaluated by George Green, Ph.D., and diagnosed

---

[2] The ALJ found Aczel to have Asperger's Disorder, which is an autism spectrum disorder
sometimes called high-functioning autism. *See* AR 21; Laura A. Carpenter et al., *Asperger's
Disorder and High-Functioning Autism*, 38:1 Pediatric Annals 30 (2009). The American
Psychiatric Association has since merged Asperger's Disorder and Autistic Disorder into Autism
Spectrum Disorder. AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF
MENTAL DISORDERS 299.00 (5th ed. 2013).

United States District Court
Northern District of California

with "severe" Asperger's disorder.  *See* AR 524.  Dr. Green determined that Aczel faced "educational limitations" when dealing with unfamiliar situations or unexpected obstacles and that Aczel had "impairment of major life activities" in the areas of learning, working, and socialization.  *Id.*

In April 1999, at age 16, Aczel was re-evaluated by Dr. Green and determined to "continue[] to be eligible for special education services under the educational classification of autism (DSM-IV diagnostic impression is asperger disorder)."  AR 529.  Dr. Green noted that Aczel's speech and language therapist reported that "[w]hen [Aczel] came to Gunn [High School] he was not speaking in class but he is now able to contribute to class discussion."  *Id.*

In February 2008, at age 25, Aczel was evaluated by Jane Carey Kahn, Ph.D., and diagnosed with Asperger's Disorder as well as, tentatively, Generalized Anxiety Disorder and Social Phobia.  AR 315–20.

In October 2008, at age 26, Aczel was evaluated by a psychologist for a report to the California Department of Rehabilitation.  *See* AR 321–22.  The psychologist recommended "assistance finding work" for Aczel upon the determination that he had a Global Assessment of Functioning ("GAF") score of 65[3] and "would be able to work in [a] supportive environment" but "should not be in [a] customer service job."  *Id.*

In March 2011, at age 28, Aczel was re-evaluated by Dr. Kahn and diagnosed with Asperger's Disorder and Generalized Anxiety Disorder, with a GAF score of 50.[4]  AR 395.  Dr. Kahn noted that Aczel had "darting eye movements with very poor eye contact" and that he did "not initiate conversation or engage in socially reciprocal conversation and interactions."  *Id.*  Dr. Kahn determined that Aczel's "symptoms prevent[ed] him from being able to secure employment" and that his symptoms were "expected to be on-going and not improve with time."  *Id.*

---

[3] A GAF score of 61–70 means "some difficulty in social, occupational, or school functioning." *See* AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (Revised 4th ed. 2000).  The American Psychiatric Association has since published a fifth edition of the DSM that does away with the GAF scale.  The fourth edition was in effect at the time of Aczel's diagnoses and the ALJ's decision and is the most recent edition including the GAF scale.
[4] A GAF score of 41–50 means "serious impairment in social, occupational, or school functioning."  *See* AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (Revised 4th ed. 2000).

United States District Court
Northern District of California

United States District Court
Northern District of California

In April 2012, at age 29, Aczel was evaluated by Carina M. Grandison, Ph.D., and diagnosed with High Functioning Autism. AR 513–522. Dr. Grandison noted that Aczel's "functional level regarding social functioning is as low as it is for people who have mental retardation/intellectual disability," that he needed "much more guidance and supervision than expected for age and intelligence," that he "does not adjust to new situations," and that he did not "plan ahead, take initiative or follow through on his own." AR 516. Dr. Grandison concluded that Aczel could not "enter the competitive work force" and "require[d] significant support both around employment and housing" without which he would "not [be] capable of independent adult-level functioning." AR 518.

#### b.     Neurological Impairment: Seizure Disorder

Aczel experienced his first seizure in December 2004 at age 22 and was diagnosed with Seizure Disorder in early 2005. *See* AR 91–92. After more than five years without additional seizures, Aczel experienced his second seizure in May 2010 at age 27. *See* AR 92, 402, 417. In May 2010, an MRI of Aczel's brain revealed "[p]rominent ventricles and sulci for age, suggestive of diffuse cerebral volume loss." AR 352–53. In August 2010, another MRI of Aczel's brain revealed several lesions in his white matter. AR 352. Aczel had two more seizures in 2011 and five or six more seizures in the first half of 2012 prior to his hearing before the ALJ. *See* AR 91–92. In November 2011, an EEG recording of the electrical activity of Aczel's brain showed abnormalities. *See* AR 440. Aczel's spike in seizure episodes was understood to have been caused by his transition to a new anti-seizure medication and was expected to be temporary. *See* AR 70–71, 91–92, 505.

#### 2.     Academic and Work History

#### a.     Academic History

Aczel began receiving special education support in kindergarten. *See* AR 514. He had an "Individualized Education Plan" throughout his school years that included speech and language therapy, placement in a study skills class, and extended time for assignments. *See* AR 476, 529. With the help of these accommodations, Aczel graduated from high school on time in June 2000 with a grade point average of 3.788. *See* AR 200. After high school, Aczel earned an Associate

United States District Court
Northern District of California

of Arts ("AA") degree specializing in graphic design from Foothill College, including credits transferred from DeAnza College. *See* AR 71–73. Aczel received disability accommodations during his AA studies, including extended time for exams in a low-distraction environment.[5] *See* AR 98, 525. Aczel spent four years completing the ordinarily two-year AA degree. *See* AR 72. He graduated in 2004 with a grade point average of 3.0. *See* AR 57, 71.

### b.    Work History and Activities

Aczel began his AA studies in graphic design with the goal of becoming a computer animator. *See* AR 546. Although the California Department of Rehabilitation acknowledged that "[t]he outlook for this occupation appears guarded," it provided Aczel with financial support and an individualized employment plan during his AA studies, noting that graphic artists could find work in a variety of fields and encouraging "flexibility in the final goal." AR 546–548.

From 2000 to 2003, while studying toward his AA degree, Aczel volunteered for a few hours per week doing clerical tasks at Recording for the Blind and Dyslexic, a non-profit organization where his mother worked at the time. AR 62, 95. Aczel has volunteered with several other organizations over the years, including AASCEND, an autism organization where his mother worked for some time and where Aczel helped with spreadsheets. *See* AR 63.

From 2004 to 2007, after completing his AA studies, Aczel "occasionally" worked on computer-related tasks at Packet Island, a technology company where his father worked at the time. *See* AR 60–61. Aczel was paid for each project he worked on at Packet Island. *Id.*

From January 2007 through January 2009, Aczel worked for 12 hours per week as an office assistant at a health clinic called Bay Area Hyperbarics. *See* AR 58–59, 162. Aczel obtained the position through a family friend without an interview, and Aczel's father testified that the family friend said that "it would have been easier [for the clinic] to do the work themselves than have [Aczel] do it." AR 86, 99. Aczel left the position when his family moved to San Francisco. *See* AR 59.

---

[5] Aczel's specific accommodations could not be verified because his records were destroyed, but the Disability Access and Compliance supervisor from Foothill College listed multiple accommodations Aczel "would have" received. AR 525.

From January 2009 through June 2009, Aczel completed a short-term paid internship working 12 hours per week in the mailroom at Community Behavioral Health Services in San Francisco.  AR 57–58.  Aczel obtained this internship through a California Department of Rehabilitation training program.  AR 57–58, 162.

In 2011, Aczel joined a movie group established by the Autism Social Connection, a non-profit organization where his mother worked at the time.  *See* AR 76, 97.  Aczel's mother started the movie group herself.  *See* AR 97.  All members of the movie group were autistic and worked together under supervision to produce short movies, including acting in the movies themselves. *See* AR 76, 97.

In March 2012, Aczel began participating in a pilot program that taught autistic people to do "black box" software testing that did not require the tester to understand the software, but only to use the software as a consumer would.  *See* AR 89, 102.  Aczel's father established and operated the pilot program himself, with three participating students, including Aczel.  AR 103. Aczel's performance in the program reinforced his father's judgment that Aczel cannot do software testing or any other work without constant supervision because "the minute there is a situation that's somehow out of the ordinary, he has no idea how to proceed."  *Id*.

### D.  The Administrative Hearing

#### 1.  The Plaintiff's Testimony

At the hearing, Aczel described his academic, work, and volunteer history.  AR 56–66, 71–73, 76–77.  Aczel testified that he has never secured employment on his own.  AR 86.  He believes he can do office or design work full-time "once [he has] the skills to do something very, extremely well."  AR 67, 85.  Aczel stated that he is taking medication for seizures, described his recent spike in seizure episodes, and said he is in good health apart from his seizures and being overweight.  *See* AR 67–71.  Aczel testified that he has seen various therapists and is taking medication for anxiety, which helps keep him calm.  AR 75.  He stated that he is "extremely shy" but has friends through his movie group and black box testing program—all of whom have been diagnosed with autism—as well as online.  AR 73, 81, 88–89.  Aczel testified that he lives at home with his parents and has never lived away from them.  *Id*.  He also testified that he prepares

his own "simple" meals for breakfast and lunch, prepares dinner once per week, and has gone grocery shopping.  AR 77–78.  According to Aczel, he exercises regularly, including walking his dog and following a routine at the gym.  AR 77–79.  Aczel recalled traveling to Canada, Seattle, and Europe with his family and traveling to Canada at least once by himself.  *See* AR 82.  Aczel stated that he uses a computer for several hours a day, reads news articles and sometimes books, and watches television and movies.  AR 83–84.  According to Aczel, he drove regularly before his spike in seizure episodes but is not allowed to drive anymore and now uses public transit.  *See* AR 83.  Aczel testified that his parents support him financially and monitor his spending.  AR 84.

## 2.      The Plaintiff's Father's Testimony

After taking Aczel's testimony, the ALJ called Aczel's father to testify at the hearing.  AR 90.  Aczel's father testified that Aczel has been living with him since birth.  AR 91.  According to Aczel's father, he retired after being laid off in 2008 and his wife worked for a non-profit organization until her job recently ended.  *Id.*  Aczel's father described Aczel's history with Seizure Disorder and said that many of Aczel's seizures occurred at night and were discovered due to Aczel's confusion in the morning and lacerations on Aczel's tongue.  AR 91–94.  Aczel's father described Aczel's academic and work history.  AR 94–99.  Aczel's father testified that Aczel obtained his jobs through his parents and family friends.  *See* AR 94, 99.  Aczel's father further testified that Aczel's interpretation of his performance at his jobs was "more benign that it really should be" and that "his judgment is about a 10 to 12-year-old person, child."  AR 100–01.  Aczel's father does not believe Aczel could live independently because "[h]e would be extremely easily exploited.  If he's confronted with a situation that he hasn't had a lot of practice with, he's basically lost."  AR 101.  According to Aczel's father, the time Aczel traveled alone, he was "quite traumatized" because he did not know how to deal with the questions officials asked him.  *See* AR 102.  Aczel's father described his black box testing program and said it was reinforcing his judgment that Aczel could not work without constant supervision.  AR 103.

In his written Third-Party Function Report to the Social Security Administration, Aczel's father reported that Aczel "is very dependent on others for help to navigate the world around him."  AR 188.  According to Aczel's father, Aczel "cannot follow anything but simple instructions

1  which may need to be repeated" and needs reminders to perform chores and supervision to ensure

2  the chores are done properly.  AR 186, 182.  Aczel's father wrote that Aczel had been "disabled

3  from birth" and that his "limitations were always there."  AR 182.

### 3.  The Vocational Expert's Testimony

5  The ALJ called a vocational expert (the "VE"), Lawrence Hughes, to testify at the hearing.

6  AR 104.  The VE testified that Aczel's internship in the mailroom at Community Behavioral

7  Health Services in San Francisco was equivalent to "mail clerk" under DOT no. 209.687-026,

8  which is "unskilled, light work" at SVP level 2.  AR 105.  The VE testified that Aczel's work as

9  an office assistant at Bay Area Hyperbarics was equivalent to "routine office clerk" under DOT

10  no. 209.562-010, which is "semi-skilled, light work" at SVP level 3.  *Id*.  According to the VE,

11  Aczel's participation in his father's black box software testing program was training and "not

12  really a job" and also too narrow to have an equivalent, but "sounds like it could be semi-skilled,

13  [at SVP] level of about 3."  AR 106.

14  The ALJ asked the VE whether there were jobs in the national economy that could be

15  performed by a person of Aczel's "age, education, and past relevant work experience" who had

16  "no exertional limitations and [was] able to do simple, routine, repetitive tasks that don't involve

17  multi-tasking and involve no more than occasional interaction socially."  AR 107.  The VE

18  responded that such jobs existed in the national economy, including "machine feeder" and

19  "vehicle cleaner," both of which are "unskilled, medium job[s]" at SVP level 2.  AR 107–08.  The

20  VE added that about 140,000 machine feeder jobs existed in the national economy (including

21  10,000 to 12,000 in California) and that about 348,000 vehicle cleaner jobs existed in the national

22  economy (including 25,000 to 30,000 in California).  *Id*.  The VE testified that both jobs could be

23  performed by someone who "should not do customer service work and can do work that involves

24  minimal interaction socially."  AR 108.

25  Pointing to Dr. Grandison's neuropsychological evaluation of April 2012, Aczel's attorney

26  asked the VE whether there were jobs in the U.S. economy that could be performed by a person of

27  Aczel's "age, work experience, and education" who "could have only rare contact with co-

28  workers, supervisors, and the public," "perform two-step directions, but only if they were written

United States District Court
Northern District of California

down and demonstrated," and whose autism caused the person to "obsess with certain things and not be able to produce at a satisfactory level." AR 110. The VE responded that no such jobs existed in the U.S. economy. *See id.*

### E.     The ALJ's Analysis

#### 1.     Step 1: Substantial Gainful Activity

The ALJ determined that Aczel has not engaged in substantial gainful activity since July 30, 2000, his alleged disability onset date. AR 21. The ALJ noted that Aczel "has done some intermittent part-time work and has earnings from his work activity" but found that Aczel's work experiences "are all below the level of substantial gainful activity." *Id.*

#### 2.     Step 2: Presence of Severe Impairments

The ALJ determined that Aczel has had severe impairments—Asperger's Disorder, Anxiety Disorder, and Seizure Disorder—since his alleged disability onset date. *Id.* The ALJ did not address the Paragraph A medical criteria for similar listed mental impairments, but summarized Aczel's medical evidence, including the various psychological evaluations he has received and his recent spike in seizure episodes. AR 21–23.

#### 3.     Step 3: Sufficiency of Medical Severity

The ALJ determined that Aczel has not had an impairment or combination of impairments that meets or medically equals the severity of any listed impairment. AR 23. The ALJ determined that Aczel's seizure frequency did not meet the criteria of Listings 11.02 or 11.03 governing Epilepsy (a neurological, not mental, impairment). *Id.* The ALJ further determined that Aczel did not meet the Paragraph B severity criteria for mental impairments because he only had "mild restriction in activities of daily living, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation, each of extended duration." AR 23–24. The ALJ explained that Aczel "[was] able to complete a wide range of activities of daily living," including driving himself to school, and that Aczel "show[ed] the ability to maintain concentration, persistence, and pace" by earning his AA degree. AR 24. The ALJ also noted that Aczel "showed some improvement in his ability to participate in class discussions by the end of high school," possibly in support of her determination that Aczel's

United States District Court
Northern District of California

difficulties maintaining social functioning were "moderate" as opposed to "marked." *See id*. Finally, the ALJ determined that Aczel did not meet the alternative Paragraph C criteria for Anxiety Disorder. *Id*.

### 4.    Step 4: Residual Functional Capacity

#### a.    Prior to July 30, 2004

The ALJ determined that, prior to July 30, 2004 (Aczel's 22nd birthday), Aczel had the residual functional capacity to perform "simple, routine, repetitive tasks not requiring multitasking" and involving "occasional social interaction." AR 24. The ALJ noted that "there is not a lot of medical evidence prior to claimant's attaining age 22" and concluded that "[i]t is reasonable to rely on the evidence regarding claimant's daily activities to determine his functional limitations." AR 27–28. In support of her determination that Aczel had the residual functional capacity to perform simple work prior to age 22, the ALJ noted that Aczel "was able to attend college and obtain an associate degree with a grade point average of 3.0." AR 27. The ALJ acknowledged that Aczel received disability accommodations during his AA studies, but concluded that they were "not so extensive that they support a conclusion that [Aczel] would not have been able to do simple work." *Id*. The ALJ added that Aczel's parents and the California Department of Rehabilitation "supported [Aczel's] interest in skilled or semi-skilled" graphic design work, which "indicates that they viewed him as capable of performing such work for gainful employment." *See id*. However, the ALJ commented that the Department of Rehabilitation seemed "generous in the way it dealt with [Aczel]" and that it "does not appear it was medically necessary or reasonable for the department to support his goal to work in the area of animation." *Id*.

The ALJ acknowledged that Aczel's impairments "could reasonably be expected" to cause some of his alleged symptoms, but determined that his "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not fully credible regarding the time prior to December 1, 2010." AR 26. The ALJ gave "little weight to the recent opinions of Drs. Kahn and Grandison . . . because they did not have the opportunity to evaluate [Aczel] prior to his attaining age 22." AR 28. The ALJ gave "[s]ome weight" to the psychologist's report to the

14

1     California Department of Rehabilitation that said Aczel's GAF score was 65, indicating that he

2     had "mild symptoms or limitations" at the time of the evaluation.  *Id.*  The ALJ acknowledged that

3     the evaluation was done "long after" Aczel turned 22, but explained that "his daily activities had

4     not changed a lot."  *Id.*

5                              **b.      Since December 1, 2010**

6          The ALJ determined that, beginning on December 1, 2010,[6] Aczel had the residual

7     functional capacity to perform "simple, routine, repetitive tasks not involving customer service"

8     and with "rare interaction with the public, coworkers, and supervisors."  AR 28.  The ALJ added

9     that Aczel worked "best in a supportive work environment" and "should avoid exposure to

10    hazards."  *Id.*

11         The ALJ found that Aczel's allegations regarding his symptoms and limitations since

12    December 1, 2010 were "generally credible" because Aczel's spike in seizure episodes and related

13    MRI and EEG scans "support[] a conclusion that [his] condition worsened in 2010."  *See id.*  The

14    ALJ gave "significant weight" to Dr. Grandison's April 2012 opinion that Aczel needed

15    significant support for employment and Dr. Kahn's March 2011 opinion that Aczel could not

16    secure employment.  *See* AR 28; *see also* AR 395, 518.  The ALJ gave "[s]ignificant weight" to

17    the October 2008 psychologist's report to the California Department of Rehabilitation that said

18    Aczel's GAF score was 65, indicating that he had "mild symptoms or limitations" at the time of

19    the evaluation, but noted that Aczel's "condition has worsened since then" and that Aczel's "daily

20    activities have decreased in the time since October 2008," as demonstrated by his relinquishment

21    of driving since his spike in seizure episodes.  *See id.*

22                         **5.      Step 5: Ability to Work in the National Economy**

23                             **a.      Prior to December 1, 2010**

24         The ALJ determined that, prior to December 1, 2010, "there were jobs that existed in

25    significant numbers in the national economy that [Aczel] could have performed."  AR 29.  The

26    ALJ pointed to the VE's testimony that a person of Aczel's "age, education, work experience, and

27    _____

28    [6] The ALJ did not address Aczel's residual functional capacity during the period between July 30, 2004 and December 1, 2010.

United States District Court
Northern District of California

residual functional capacity" could work as a machine feeder or vehicle cleaner, that these jobs were medium jobs at SVP level 2, and that significant numbers of these jobs existed in the national economy. *See id.*; *see also* AR 107–08.  Having found that Aczel was able to work in the national economy prior to December 1, 2010, the ALJ determined that Aczel was not disabled prior to that date. *Id.*

### b.    Since December 1, 2010

The ALJ determined that, since December 1, 2010, "there have been no jobs that exist in significant numbers in the national economy that [Aczel] can perform."  AR 30.  The ALJ found that Aczel's "ability to perform work at all exertional levels has been compromised by nonexertional limitations" that "so narrow the range of work that [he] might otherwise perform that a finding of 'disabled' is appropriate." *Id.*  The ALJ noted that "Social Security Ruling 85-15 indicates that the substantial loss of ability to respond appropriately to supervision, coworkers, and usual work situations would lead to a finding of disability." *Id.*  Having found that Aczel has not been able to work in the national economy since December 1, 2010, the ALJ determined that Aczel became disabled on that date. *Id.*  The ALJ added that "[m]edical improvement is expected with appropriate treatment" and recommended a continuing disability review 18 months from her September 2012 decision. *Id.*

### F.    The Present Motions

#### 1.    The Plaintiff's Motion for Summary Judgment or Remand

##### a.    Reversal of Disability Onset Date

Aczel argues that he is entitled to a reversal of the Commissioner's disability onset date because the "record as a whole establishes that [he] suffers from non-exertional impairments, which precluded all work prior to the age of twenty-two." *See* Pl.'s Mot. at 16.

##### b.    Remand for Further Proceedings

In the alternative, Aczel argues that further proceedings are warranted because the ALJ failed to provide reasons for discounting the testimony of Aczel's father and the ALJ's decision was not based on substantial evidence. *Id.* at 16–17.

First, Aczel argues that the ALJ "failed to provide reasons for rejecting his father's

16

United States District Court
Northern District of California

United States District Court
Northern District of California

1   testimony." *Id*. at 12–14.  Aczel emphasizes the Third-Party Function Report completed by

2   Aczel's father, in which he testified that Aczel required significant assistance and supervision

3   while working and that Aczel was disabled from birth.  *Id*.; *see also* AR 181–88.

4          Second, Aczel argues that the ALJ's decision is not based on substantial evidence.  Pl.'s

5   Mot. at 14–16.  Aczel takes issue with the ALJ's analysis at Step Four, where she determined that

6   Aczel could perform simple work before age 22 on the grounds that he was able to obtain his AA

7   degree and that his parents and the Department of Rehabilitation supported his pursuit of semi-

8   skilled graphic design work.  *See id*. at 15; *see also* AR 24–28.  Aczel emphasizes that it took him

9   four years to obtain the ordinarily two-year AA degree and that he received disability

10  accommodations during his AA studies.  *See* Pl.'s Mot. at 15.  Aczel adds that a person's pursuit

11  of an academic degree is "not a clear indication" that the person can sustain independent gainful

12  employment, and that in fact the opposite conclusion is warranted in Aczel's case, since he has

13  never obtained a job on his own and has worked only in sheltered environments.  *See id*. at 15–16.

14  Finally, Aczel takes issue with the ALJ's unqualified statement that he testified to having friends.

15  *Id*. at 16.  Aczel notes that his friends are other autistic individuals in a supervised movie group

16  and that he otherwise spends time with others only online.  *Id*.  Aczel argues that the unqualified

17  characterization of him as someone who has friends "does not take into consideration the time

18  period prior to 2010" (presumably because he joined his movie group in 2011, after the ALJ's

19  December 1, 2010 disability onset date).  *See id*.

20                  **2.      The Commissioner's Motion for Summary Judgment**

21         The Commissioner moves for summary judgment and argues that her final decision should

22  be affirmed.  Comm'r's Mot. at 2, 6.  In the alternative, the Commissioner argues that the Court

23  should not award benefits, but instead remand for further proceedings.  *Id*. at 6.

24         The Commissioner argues that the ALJ properly evaluated the credibility of Aczel's father

25  because "an ALJ need only give germane reasons for discrediting the testimony of a lay witness"

26  and the ALJ provided such reasons for finding Aczel's father not credible "on the narrow issue" of

27  Aczel's disability prior to his 22nd birthday.  *Id*. at 3–4.  The Commissioner further argues that the

28  ALJ's decision is supported by substantial evidence and free from legal error because Aczel has

1  not identified any reversible error.  *Id*. at 4–5.  The Commissioner notes that the record does not

2  include medical evidence establishing the onset of disability before July 30, 2004 and that Aczel is

3  responsible for providing such evidence.  *Id*. at 5.

### 3.  The Plaintiff's Reply Memorandum

5  Aczel replies that the ALJ did not provide germane reasons for discounting Aczel's

6  father's testimony and that in fact "the ALJ did not provide any reasons for rejecting his

7  testimony, which is required."  Reply at 2.  Aczel requests that the case be remanded.  *Id*.

## III.  ANALYSIS

### A.  Legal Standard

#### 1.  Discounting Lay Witness Testimony

11  Medical diagnoses are "beyond the competence of lay witnesses," but "lay testimony as to

12  a claimant's symptoms or how an impairment affects ability to work is competent evidence . . .

13  and therefore cannot be disregarded without comment." *Nguyen v. Chater*, 100 F.3d 1462, 1467

14  (9th Cir. 1996) (citations omitted); *see also* 20 C.F.R. § 404.1513(a) (listing medical sources who

15  can provide evidence establishing a medical impairment), 20 C.F.R. § 404.1513(d)(4) (listing

16  "other non-medical sources" that can be used to show the severity of an impairment, including

17  spouses, parents, relatives, caregivers, and friends).  An ALJ who wishes to discount the testimony

18  of a lay witness "must give reasons that are germane to [that] witness." *Dodrill v. Shalala*, 12

19  F.3d 915, 919 (9th Cir. 1993).  One such reason may be inconsistency between the lay witness's

20  testimony and medical evidence.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005) (citing

21  *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001)).

#### 2.  Substantial Evidence

23  Reviewing courts must take as conclusive any findings of the Commissioner that are free

24  from legal error and supported by "substantial evidence."  42 U.S.C. § 405(g).  "Substantial

25  evidence means more than a mere scintilla but less than a preponderance; it is such relevant

26  evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v.*

27  *Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995); *see also Richardson v. Perales*, 402 U.S. 389, 401

28  (1971); *Desrosiers v. Sec'y of Health & Human Servs*., 846 F.2d 573, 576 (9th Cir. 1988);

United States District Court
Northern District of California

18

1     *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975).

2         Reviewing courts must consider "both the evidence that supports and the evidence that

3 detracts from the Commissioner's conclusion," *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir.

4 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)), and must affirm the

5 Commissioner's decision "where the evidence is susceptible to more than one rational

6 interpretation." *Andrews*, 53 F.3d at 1039–40.  However, a reviewing court must consider the

7 record as a whole and may not affirm simply by isolating a "specific quantum of supporting

8 evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citing *Hammock v.*

9 *Bowen*, 879 F.2d 498, 501 (9th Cir. 1989)).

10                      **3.**      **Duty to Develop the Record**

11         In deciding Social Security cases, administrative law judges have a "special duty to fully

12 and fairly develop the record and to assure that the claimant's interests are considered." *Smolen*,

13 80 F.3d at 1288 (quoting *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983)).  "This duty exists

14 even when the claimant is represented by counsel." *Brown*, 713 F.2d at 443.

15      **B.**      **The ALJ Improperly Proceeded to Step Five with Respect to the Period**
16               **Between July 30, 2004 and December 1, 2010**

17         At Step Five of her analysis, the ALJ determined that Aczel could work in the national

economy prior to December 2010.  AR 29–30.  However, at Step Four of her analysis, the ALJ did

18 not address Aczel's residual functional capacity for the six-year period between his 22nd birthday

19 and December 2010.  *See* AR 24–29.  The ALJ erred by improperly proceeding to Step Five

20 without first completing Step Four with respect to this period.

21      **C.**      **The ALJ Failed to Give Germane Reasons for Discounting Aczel's Father's**
22               **Statements in His Third-Party Function Report**

23         The ALJ did not explicitly address Aczel's father's statements in his Third-Party Function

24 Report and give reasons for discounting those statements.  Instead, the ALJ came to conclusions

25 that contradicted Aczel's father's Third-Party Function Report and gave reasons supporting those

26

27

28

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

conclusions without commenting on Aczel's father's report.[7]  Specifically, the ALJ determined that Aczel had the residual functional capacity to perform simple work prior to his 22nd birthday (and since December 2010, but with more non-exertional limitations) and that Aczel had the ability to work in the national economy prior to December 2010, even though Aczel's father wrote that Aczel's current symptoms were present since his birth.  *See* AR 24–30, 182.  In doing so, the ALJ "disregarded without comment" Aczel's father's statements in the Third-Party Function Report.  *See Nguyen*, 100 F.3d at 1467.

The Commissioner argues that the ALJ "certainly provided germane reasons" for discounting Aczel's father's statements, including that Aczel's medical treatment was "conservative" before his first seizure in 2004 and that Aczel's parents supported his interest in animation.  Comm'r's Mot. at 4.  The ALJ did not, however, present these as reasons for discounting Aczel's father's statements.  *See* AR 24–28.  She discussed them in the context of other conclusions, such as her determination that Aczel had the residual functional capacity to do simple work prior to his 22nd birthday and that Aczel's own testimony concerning the "intensity, persistence and limiting effects of [his] symptoms [was] not fully credible regarding the time prior to December 1, 2010."  *See* AR 26–27.  The ALJ did not explicitly address Aczel's father's statements and explain why she was discounting them.  *See* AR 24–28.  Instead, she "disregarded [them] without comment," which was legal error.  *See Nguyen*, 100 F.3d at 1467.

### D.   The Disability Onset Date of December 1, 2010 is Not Supported by Substantial Evidence

Aczel's functional limitations seem to result primarily from his Autism Spectrum Disorder and Anxiety Disorder, not his Seizure Disorder.  Social Security Ruling 85-15, which the ALJ referenced in determining that Aczel has not been able to work in the national economy since December 2010, provides that "[t]he basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) . . . to respond appropriately to supervision, coworkers, and usual situations; and to deal with changes in a routine work setting."

---

[7] The Third-Party Function Report is competent lay evidence and constitutes lay testimony for the purposes of this analysis.  *See Jones v. Astrue*, No. EDCV 08-1620 JC, 2010 WL 701874, at *3 (C.D. Cal. Feb. 25, 2010).

SSR 85-15; AR 30.  Aczel's difficulties with satisfying these demands seem to result primarily from his Autism Spectrum Disorder and Anxiety Disorder—which limit his ability to interact with others and handle unexpected scenarios—not his Seizure Disorder.  *See* AR 395, 516.  Similarly, the functional limitations ascribed to Aczel by his father and Drs. Kahn and Grandison in their 2011 and 2012 psychological evaluations are primarily related to Aczel's Autism Spectrum Disorder and Anxiety Disorder, not his Seizure Disorder.  *See id.*

Unlike his Seizure Disorder, Aczel's Autism Spectrum Disorder and Anxiety Disorder do not appear to have worsened in the period leading up to December 2010.  The ALJ pointed to substantial evidence in support of her conclusion that Aczel's "seizure disorder has worsened since his second seizure in 2010" and, similarly, that Aczel's overall "medical condition has worsened since the seizure in May 2010."  *See* AR at 28.  However, the ALJ did not point to substantial evidence suggesting that Aczel's Autism Spectrum Disorder or Anxiety Disorder worsened in 2010.

Aczel was diagnosed with Autism Spectrum Disorder as a child, that diagnosis was repeatedly confirmed by various evaluators, and Aczel's father testified that Aczel's current symptoms and limitations were present since Aczel's birth.  *See* AR 182, 315–20, 395, 475–84, 513–522, 526–28.  Aczel was not officially diagnosed with Anxiety Disorder until 2011, but he was tentatively diagnosed with it in 2008 and even his earliest psychological evaluations emphasize his difficulty with social interaction.  *See* AR 315–20, 395, 475–84.  Aczel's success in high school and attainment of his AA degree are not substantial evidence that his Autism Spectrum Disorder or Anxiety Disorder worsened since those accomplishments, which Aczel achieved only with the help of disability accommodations precisely intended to facilitate his success despite his mental impairments.  *See* AR 525, 529.  The fact that Aczel's parents and the Department of Rehabilitation supported his pursuit of an animation career is not substantial evidence that Aczel's Autism Spectrum Disorder or Anxiety Disorder have worsened since he received that support, but rather—as the ALJ indicated—that his parents and the Department of Rehabilitation were generous with Aczel and perhaps unrealistic about his options.  *See* AR at 27.  The Department of Rehabilitation even acknowledged that the outlook for Aczel's animation

career was "guarded" and encouraged him to show "flexibility in the final goal."  AR 546.

Absent substantial evidence that Aczel's Autism Spectrum Disorder or Anxiety Disorder worsened in the period leading up to December 2010 (or a determination that Aczel's functional limitations are primarily the result of his worsened Seizure Disorder as opposed to his Autism Spectrum Disorder and Anxiety Disorder), the disability onset date of December 1, 2010 is not supported by substantial evidence.  The ALJ should conduct further proceedings to "fully and fairly develop the record" with respect to Aczel's disability onset date.  *See Smolen*, 80 F.3d at 1288.

## IV.    CONCLUSION

The ALJ did not complete the five-step disability analysis with respect to the period between July 2004 and December 2010, failed to give germane reasons for discounting Aczel's father's statements in his Third-Party Function Report, and determined a disability onset date that was unsupported by substantial evidence.  For the foregoing reasons, the Court GRANTS Plaintiff's Motion for Summary Judgment, DENIES Defendant's Motion for Summary Judgment, and REMANDS this case to the Commissioner for further proceedings consistent with this Order.

**IT IS SO ORDERED.**

Dated: July 16, 2015

_____
JOSEPH C. SPERO
Chief Magistrate Judge

United States District Court
Northern District of California